Mr. McCormick, are there five conspiracies in this case or four? The 53-1, which is a motion for identification of unindicted, unnamed co-conspirators referenced in the indictment, also appears to be proscribed by representations of the government, and the court will be prepared to rule on any issues that may arise. However, it appears from the record at this stage that there are none. The motion is denied. Your Honors, I believe it's crystal clear that Defense Counsel Mr. Black filed a motion for disclosure of unindicted co-conspirators. The government responded that there were none, and the court so ruled. That was and is the law of this case. Under that ruling, Mr. Hamblin was not a co-conspirator. Therefore, it logically follows that Ms. Bigelow's testimony as to what Mr. Hamblin said, her testimony at trial, was clearly hearsay in violation of Crawford. The government, in its response brief, says, well, one time it was raised, and another time there was no objection. Well, I pointed out in the reply brief, yes, there were two times Ms. Bigelow so testified. In her testimony, the gist of her testimony was that Hamblin told me that they, in the context they had to mean Hess and the defendant, were out in the truck readjusting the load. And so when she made that statement, she definitely incriminated the defendant by demonstrating his knowledge of what was going on, and contrary, of course, to his testimony at trial. Now, the first time she mentioned it, Mr. Black failed to object. Okay. We've got plain error. But the second time she mentioned it, there was clearly an objection based on hearsay. The court overruled the objection. The testimony continued. Later, there is some confusion. I apologize. In my opening brief, I think I caused some additional confusion because when the court later ruled or later heard the arguments of Mr. Black concerning a mistrial, he started making arguments concerning another hearsay statement. That was the hearsay statement by Bigelow stating that Hamblin told her to move her car because they were going to bring a U-Haul truck through the driveway and her car was blocking it. That's not the hearsay statement we've raised on appeal. We've raised the two hearsay statements where she indicates they, meaning Hess and the defendant, are out working on the loading, and that obviously implicates the defendant, shows he's got knowledge of what's going on. If he's out at the truck, he's got to know there's something going on, and he's helping with the shifting of the load, meaning in the context of shifting the load, it was all about moving the lids off the top of these crates or these plywood-type loads, and they were basically coffins. They were hauled out. They had to move the lids off, put the marijuana in from the U-Haul, and then put the lids back on. Kagan. Well, now, law of the case is not immutable, is it? I'm sorry? Law of the case is not immutable. I'm a former trial judge. Oh, that's right. Evidence can come in during the course of the trial that will make the judge make a redetermination of a ruling that's been made earlier on the basis of the evidence that has been presented since the original ruling. Has that not happened here? Well, and he makes the ruling in the context of the hearsay objection. How fair is that under due process concerns? Now Mr. Black and the defendant are caught totally by surprise. They're told the beginning before trial there's no unindicted co-conspirators. Here in the middle of trial, a crucial point in testimony, all of a sudden the Court rules, oh, Hamlin, any witness can talk about Hamlin until the cows come home because he's an unindicted co-conspirator. Well, I don't think anyone knew exactly what this woman was going to say. Unfortunately, a trial is a work in progress where lawyers try to control what people say, but they blurt out the darndest things. And then the question is, is it admissible under any theory? And that was then the analysis was made there. Well, you're absolutely correct, Your Honor. There was a surprise. And speaking of surprise, the government's, well, the Court in its ruling and the government takes a position. Well, this information on Hamlin was available through discovery. Well, hogwash, it didn't exist. It couldn't have been a discovery because it was a total surprise. She told, Bigelow told the police, the special agent, that it was the defendant who made the statement. And then she, as we know, according to the government, she changed her testimony and said it was Hamlin. Well, how do you prevent that kind of problem? You call Bigelow before the grand jury with or without immunity. If she takes the fifth, you grant her immunity and you lock her in on her testimony, especially when it's such serious testimony that she's going to implicate the defendant in loading or unloading this load of marijuana. So the surprise could have been eliminated. I guess I don't see this statement as nearly as significant as what you're saying it is in terms of everything else that was, I mean, what that was seen there. There also, what, Hess testifies, right? Yes, Your Honor. And the officers are doing some sort of surveillance of what's going on and then certain things are recovered. You know, I guess why does this even matter that much, this statement? Well, because Hess is the only one that point blank says the defendant was involved. All the rest of the evidence is circumstantial, and that's why it's so important. Well, but circumstantial evidence in terms of where it was located, what the police were observing, who owns the vehicles, you know, all of that stuff, and, I mean, that can be, circumstantial evidence can be as damning as direct evidence and sometimes more. Understood, Your Honor. But we submit that in the total context of the trial, that this was highly damning to the defendant, because you've got Hess who testifies, but he's got the sweetheart deal, so you always have the defense argument that, yeah, he's got a sweetheart deal, so he's going to say whatever he wants to say to suit his purpose. And that is always happening in these kinds of trials. But then you've got no other witness. You don't have, where's Hamlin? That's kind of strange. Hamlin, oh, all of a sudden Hamlin's an unindicted co-conspirator. Well, before that he was not an unindicted co-conspirator. He was not a witness. And he was there at the scene. He was, you know, it's a curious issue as to why he's not called by the government as a witness. And he was available, so we're back to, you know, Crawford. Well, you knew he was there too, right? I'm sorry? You knew Hamlin was at the scene. Everyone knew Hamlin was at the scene, right? Yes, Your Honor. And I've got 12 minutes unless there's questions I'll reserve. Thank you, Your Honor. Hear from the government? Good morning. I'm Glenn McCormick, assistant U.S. attorney for the government in this case. I appreciate counsel starting off with essentially the concession that this is a plain error standard with regards to the Confrontation Clause issue because the information came out as to the first. I don't think he did concede it on the second statement. No. As to the first statement, he did. I'm sorry. It's not the second, though. The second statement was a different issue. That was a hearsay objection at trial and then subsequently a Confrontation Clause objection during a hearing out of the presence of the jury. That's correct. Well, no, but I think in that dialogue that happened, first about there wasn't an objection and then when it's clarified as to that Hamlin was the one that said it, there is an objection there. So I think that's all part of the first thing he's objecting to. Correct. If we take the statements, and I like to refer to them as the they were out back shifting the load statement and the U-Haul coming around statement, those are separate and distinct at different times of the day as well as different times in the testimony. And we're talking right now about the shifting of the load statement. And there was never a Confrontation Clause objection as to that statement at all during trial at any time. It came up first during the brief. So if the government's stuck with the notion that it's a representation that this person is not an undided co-conspirator, is not an indicted co-conspirator, certainly is not a co-conspirator of any sort, where does that leave us if you're stuck with that? We're making an assumption here. Yeah, that's why it's a hypothetical question. If you're stuck with that, where does that leave you? If we're stuck with that, then we are left with that statement coming in as hearsay. Because if he's not an undided co-conspirator, if Hamblin is not an undided co-conspirator, then his statement wouldn't be in furtherance of the conspiracy, he's not a member of the conspiracy, it's not going to meet that standard. Right. So it's hearsay. Certainly. Okay. But what evidence are you left with? Why, is that statement that he says it's, you know, the appellant's counsel says that's very crucial as to that it's part of it and that the whole house of cards falls. No, the government's position is that it's not. This was continual surveillance of this incident from the northwest, from Idaho, all the way into Arizona. The truck was walking. Okay, take the evidence of that statement out. What is the evidence against the appellant? There is the surveillance, the observations of the law enforcement officers that this truck came to this place, parked in a very strange way at a residence, that a U-Haul truck was observed coming, that a load of something was obviously transferred, that the U-Haul truck. Okay, who's seen driving the truck that comes to the residence? Who owns the residence? Who's seen driving the U-Haul? Okay, I'm sorry, Your Honor. The semi-truck is driven by Mr. Hess. Just to give your best case. Yes. The semi-truck driven by Mr. Hess arrives at the defendant's property. It backs up into his substantial property. And there is a picture in the S.E.R. which shows the residence and its tree, et cetera. And it backs up into this area. Okay. And agents observe the defendant and Mr. Hess drive away in the defendant's car and go to a nearby convenience store where a meeting is held. During that meeting, agents are observing this. Actually, one of the agents walks by that meeting and overhears part of the meeting. And they talk about getting back together again. Now the defendant leaves with Mr. Hess and they go to this location out in the middle of nowhere. And there's a picture of that as well in the S.E.R. And there's this white vehicle you can see in the center of the picture at these crossroads in the middle of nowhere. Now, Mr. Hess came in at the end in this trial and explained what everything that was happening. Okay. Mr. Hess is the first to squeal gets the deal, right? And so he testifies against the appellant. Correct. Correct. And then they run a couple of errands and they come back to the house. The next day, a U-Haul truck is observed coming to Mr. Stolkup's house. And what do you know, but the driver of this U-Haul truck is one of the people that the agents observed the day before at the convenience store during this meeting between Mr. Hess and these other people. And, no, Mr. Stolkup was not present during that meeting. He was by his car at the gas pumps. He was not standing there by these people during that meeting. The U-Haul truck comes. It's there 20 minutes or so, and then it leaves. It's pulled over by the agents. What do you know, there's nothing in it, but the canine dog alerts to the smell of something that it's trained to sniff out, and that is controlled substances. And Mr. Montijo is arrested, taken away. Later that evening, Mr. Hess leaves in his truck. He's pulled over. He has 1,500 pounds of marijuana secreted in these what they called coffins. It was particle board. The center is hollowed out, and just the tops were straps down on top to make it look like they're complete loads of particle board. So now Mr. Hess comes in and testifies that he was approached by a man by the name of Miguel Acevedo to move marijuana, that he was to come to Arizona. He would be called. He would meet with people. He himself needed to find a place to transfer this load. He said that he talked to Mr. Stallcup about where they could do this. That's why they drove out to this strange location in the middle of nowhere. They were looking for a place, but they had agreed there really wasn't enough cover out there, and as you see in the picture, it's fairly low shrubbery in the area. And then you look at the defendant's house, and he's got tall trees and a house and a roundabout where the U-Haul truck can come back behind the house where the dope can be secretly transferred from the U-Haul into the truck. These are all things that Mr. Hess testified to. He testified that he, in fact, wanted his testimony to help the defendant. He didn't want to get him in trouble, but his initial cooperation, that was his hope. And he had no animus towards the defendant. He considered him a friend. It was difficult for him. Now, that's the general surveillance and general statement of Mr. Hess. Very strong surveillance evidence, very strong evidence of the cooperator. He was extensively cross-examined by Mr. Black, if you'll look at the record, step by step by step as to everything he talked about, and there was really nothing he could trip him up on. Mr. Hess had an amazing memory, frankly, because, as you will see in the record, he did not even have the reports. We never gave him the reports. He didn't have anything to refer to but his memory with regards to what happened, and everything lined up with what was seen in surveillance. Take now Ms. Bigelow and take away her statement there regarding the hearsay. What was uncontroverted is that in the Sally Port at Scottsdale Police Department, when she was there with Mr. Stahlcup, the defendant, the defendant told her, hey, don't say anything about a U-Haul truck coming to the house. Well, we've got to ask, well, where did that come from if it's not knowledge of the fact that a drug transaction was taking place at his house? So we have all of these other factors aside from this one statement, which if the Court were to consider it hearsay, that it really would be a harmless error, because everything else, when lined up, it points straight at Mr. Stahlcup. It all happened at his house. He was present with Mr. Hess driving around to these strange locations. And his own statement to the police, in fact, there were several lies that he told. Now, who ends up getting stopped with the dope? Mr. Hess drives away about 1 in the morning with his semi-truck and is pulled over. Okay. So going back to the initial hearing when you were, and you were the trial attorney, right? Yes, I was, Your Honor. When you said that there were no unindicted co-conspirators, what did you mean to the Court? I don't think it's a law of the case problem, but it may be an estoppel problem for you. No, I agree there is no law of the case problem. The context of that whole argument, and, again, that happened a year before the trial, if you look at the dates. But estoppel is estoppel. I mean, if you're saying there's no time limit on that. Yes, correct. Explain to me the context. The context of it was there was a motion filed by Mr. Black to determine who the unindicted co-conspirators might be. He expressed a concern on the record that there was who knows who might be up in Oregon or the northwest or somewhere else, and he was concerned about multiple conspiracies. In fact, he had another motion he filed that there were multiple conspiracies, and he was trying to limit this case to this conspiracy, to these people. Now, in his mind, certainly, Mr. Black wanted this to be limited to Mr. Montijo, Mr. Torres, Mr. Miguel Acevedo, who he didn't even know about at that point, and Mr. Hess, and he didn't want his own client considered in that conspiracy. However, the disclosure that was provided, which the Court notes also was on the record that it was provided, showed that Mr. Stahlcup was there, that Ms. Bigelow was there, that Mr. Hamblin was there. Counsel makes a good point that the disclosure did not say that Hamblin said they were out backshifting alone. The disclosure says that Stahlcup made that statement to Ms. Bigelow. That was a surprise to everyone at trial. That was different, and the Court picked up on that. That was. But when you're given lemons, you make lemonade, and that's what happened here. That was the statement. That's what she says. Under oath is the truth. She had never been under oath before. Now she's under oath, and that's what she says, and that's the evidence that we have. Let me ask you a couple of follow-up questions, if you don't mind, about the hearing. In the transcript, it says, so are there any unindicted, unnamed co-conspirators referenced in the indictment other than the people who grew the marijuana or the people it might be distributed to, or any unnamed co-conspirators directly related to this conspiracy? And your answer was not that I would have as a witness at this point, right? Correct. Then you go on to say, and there's some discussion about the confidential informant, and you say, I would disclose these people prior to calling them. Who are you talking about? There was a confidential informant in the Northwest. We're not talking about the CI at this point? Correct. Okay. You're not talking about other unindicted co-conspirators? No. And really, there isn't enough record for me to even make any argument about Mr. Hamblin and his situation. So I have really nothing I can say to that. But I can tell you that was with regards to a CI in the Northwest. Okay. That's the context. No, that clears it up for me. Thank you. If I may move on to the motions for mistrial, for which it is an abuse of discretion standard, the first one that they bring up is the mention of Ms. Bigelow's probation. What should be clear in the record is that she was a hostile witness, and the court, in fact, agreed that that was the case during a hearing out of the presence of the jury. And something needed to be done to explain to this jury why her statement would be different, not just the fact that she's a friend of the defendant. That's something that might be present in any trial. But why would she say one thing to the police when the arrests were taking place in search warrant, and then another thing in front of the jury? And that's why it's important to show the difference. She had a bias against the government that everybody agreed, even Mr. Black, the defense counsel during the hearing outside of the presence of the jury, said that she was ‑‑ she had an anti‑government bias. The court agreed. There was certainly an animus towards the government. But that was the case. So we needed to show why. What's going on here? Why would she make a statement that's different in these two times? If you look at what the statement is, she seems to be trying to pull culpability away from her friend, Mr. Stolkup, the defendant. And at the time she made the initial statement, she's on probation. She's subject to being given problems of her own if she's untruthful. She has pressures on her at that point that she doesn't have when she's in front of the jury. So there is a ‑‑ the reasons to show that bias, that reason for bias, the explanation for why she was the way she was in the stand. Same thing for the issue of the note that she provided. Well, she actually didn't provide, that we discovered during an interview of her. It was a rare opportunity to see what's going on in the witness of the brain of a hostile witness. She just made the mistake of writing it down rather than just keeping it as a thought in her head. And we got to use that at trial to show this witness, ladies and gentlemen of the jury, you need to carefully weigh what she has to say, because she has some biases here. You need to be aware of that. And they can do with that as they may, which is their province. The final one was the statement with regards to the polygraph. That was invited. Mr. Hess showed extreme caution when being asked this open‑ended question over and over. Did the government do anything to tell whether or not you were, to determine whether or not you're telling the truth? Three times he's asked in the course of this colloquy. Three times. Was it in any of the discovery that was provided that he had taken a poly? The only thing that would have been in the discovery was the plea agreement. And the plea agreement, which I will note, was not entered before the jury, and that aspect of it was not discussed before the jury. But there is a requirement in the plea agreement that he take ‑‑ that the government can, if they desire, have him take a polygraph examination. That was clearly in the plea agreement. And at the time, Mr. Hess had taken a polygraph. Now, he responded, what was described as a moment of silence, but it really wasn't. You can see that Mr. Black asked him, go ahead with whatever it is you're about to say, and he did. The court immediately struck it from the record and advised the jury not to pay attention to it. And that's exactly what the court should have done. And I believe the cases show that that's an appropriate response to the situation. And in light of everything else in this case, if it were an error, it was harmless. But it really wasn't an error because the court really handled it well.  Thank you, counsel. Thank you, Your Honors. Your Honor, it's clear the court recognizes we don't have the plain error standard because the second hearsay statement, that is Bigelow's testimony as to what Hamblin said about the defendant, there was a timely objection. So we really come to the test under Crawford, which is a de novo test, which is a trial test, and then the harmless error test. And so this court, of course, yes, there is considerable circumstantial evidence, but this court must decide in light of this hearsay testimony, which was admitted over objection, can this court find beyond a reasonable doubt that it was not ñ that it was harmless? What about that? What about the polygraph? Isn't that kind of oops? Wish I hadn't asked that question. Yes, Your Honor. And those other issues, frankly, are not ñ as you may have noticed, I didn't raise them in my opening here. I don't want to call them also rands, but they are not nearly as strong as Crawford, therefore I didn't devote any oral argument time to them. We've all asked those questions that we were sorry when we got the answer. Correct. And I've thrown in the cumulative error because those just aren't strong questions like Crawford. Well, if the witness was, in fact, a co-conspirator, then you would agree that the evidence properly came in, right? Oh, yes, Your Honor. So does your entire argument rest on what the representation was by the government that year before trial? That's correct, Your Honor. Under notions of ñ the court mentioned estoppel, under notions of due process, what the court could have done is said, wait a minute, we've got a problem here, and perhaps declared a mistrial because he was not disclosed previously as a co-conspirator, and Mr. Black hasn't had opportunity to prepare in that regard. Well, in viewing the hearing the year before, it appears in context everybody's talking about the Oregon witnesses, not about the local witnesses. Is that the way you read it? No, Your Honor, not at all, and that's why I read from part of it previously, and I'll look at it again. And there's not that many pages, so I disagree with the government's position that this ruling is in context of the co-conspirators with respect to another conspiracy. Yes, the court and counsel talked about both issues, but at page 4 of the ER, that was the question of the court, Mr. McCormick, are there five conspirators in this case, meaning this indictment, or four? And then there's some colloquy, just a couple of pages, and it talks about informants and whether the informant's going to be disclosed and so on, but when the court rules over page 71, which I read previously, at line 7, the 53-1, that's the docket number, which is motion for identification of unindicted, unnamed co-conspirators referenced in the indictment. Now the court is ruling, and it's clear that the court has heard counsel, and it's clear in the context of this hearing that we're talking about there are no unindicted co-conspirators as to this indictment that we're going to trial on. Would you say, let's assume what you, your interpretation of that is accurate and he was making a representation as to all co-conspirators, doesn't the trial court have a duty to make that determination independently? In other words, the government may be a stop from arguing it, but let's say that the objections made on hearsay and the trial judge said, well, you know, I think she's a co-conspirator, and therefore I'm going to allow it in. Why isn't the trial court permitted to make that kind of judgment, even though the government may have represented that the person's not a co-conspirator? Well, perhaps the trial court may do so, but not by ambush. We shouldn't have trial by ambush. In other words, if you're in the middle of the trial and you've got a key witness on the stand, it throws the defense off entirely. I mean, how fair is that Sixth Amendment right to jury trial in fairness and due process Fifth Amendment? How fair is that to the defendant to permit that kind of important ruling right in the middle of trial? I think if the court was to make that determination and if, assuming the government counsel wanted to proceed with Mr. Hamlin as a co-conspirator, especially in light of the surprise from Ms. Bigelow, then the court should declare a mistrial and they start all over. Now we know Hamlin, now the defense knows that Hamlin's a co-conspirator and any kind of surprise can come in. But sometimes as a trial judge, you have to deal with surprises, and you can't easily declare a mistrial in every trial. You've got to consider what the evidence is and where you're going, and you've got to make very quick decisions based on surprises coming down on you. And in view of what had been presented in the trial so far, is it illogical to say that Hamlin was not a co-conspirator? But, Your Honor, this isn't – I hear what the Court's saying, but this isn't some Rule 403 type ruling. This is serious stuff. This is Crawford. This is confrontation clause under the Sixth Amendment U.S. Constitution. So I think that rises to a much higher standard. Very important decisions have to be made very quickly when you're a trial judge. I understand, Your Honor, but if the trial judge makes, as in Crawford, the trial judge made the error, and that was obviously reversed. But my point is there's some errors that are harmless, and there are other errors that when you're on a confrontation clause, a constitutional issue, not just Rule 403 or relevance or some other evidentiary ruling, that's serious stuff compared to the other. And then it's time – and, of course, we're playing Monday morning quarterback. We're not in the throes of the trial and how it's proceeding, but looking back, that's the duty of this Court, of course, to look at that and say, is there proof beyond a reasonable doubt that it's harmless? And I urge you that it is not harmless in the context of this case. Thank you, counsel. The case is heard. It will be submitted, and we will be in recess for the morning. Thank you both for your arguments. They've been quite helpful.
judges: Thomas, Callahan, Roth